25 P.3d 817

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Elujino V. ALVAREZ, III,**
**Defendant–Appellant.**

No. 22985.

Intermediate Court of Appeals of Hawai'i.

May 24, 2001.

As Amended June 6, 2001.

intervention/ anger management and parenting counseling until clinically discharged. His sentence was stayed pending this appeal.

Alvarez contends that the trial court (1) erred by failing to instruct the jury on the material element of receiving a written warning citation; (2) erred by admitting irrelevant and/or impermissible character evidence of his post-arrest conduct; and (3) had insufficient evidence before it to find that a cooling-off period was necessary, that he had received a written warning citation pursuant to HRS § 709–906, and that he possessed the requisite state of mind. We agree with Alvarez's contentions regarding (1) the prejudicial error in the trial court's failing to instruct the jury on the element of the written warning citation requirement and (2) the insufficiency of the evidence establishing that Alvarez received a written warning citation pursuant to HRS § 709–906. The trial court's November 17, 1999, judgment is reversed.

Taryn R. Tomasa, Deputy Public Defender, for defendant-appellant, on the briefs.

James M. Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff-appellee, on the briefs.

BURNS, C.J., WATANABE and FOLEY, JJ.

Opinion of the court by FOLEY, J.

On June 16, 1999, Defendant–Appellant Elujino V. Alvarez, III (Alvarez) was charged by complaint with refusal to comply with a lawful order of a police officer in violation of Hawai'i Revised Statutes (HRS) § 709–906(1) & (4) (Supp.2000), for refusing a police officer's order to observe a twenty-four hour cooling-off period by leaving his home. On November 12, 1999, pursuant to a jury trial in the Circuit Court of the First Circuit, the Honorable Elwin P. Ahu presiding, Alvarez was convicted as charged. On November 17, 1999, Alvarez was sentenced to probation for two years and incarceration for thirty days and was ordered to attend domestic violence

## I.

Honolulu Police Department (HPD) Officer Barry Tong (Officer Tong) testified that on June 15, 1999, he responded to a call from HPD dispatch at approximately 12:52 p.m. directing him to the 146 block of Maluniu Street where a "very bad argument" and possibly a person being beaten were occurring. When Officer Tong arrived at the block, a neighbor was pointing at the house at 146–B Maluniu—so Officer Tong parked in front of its driveway. Initially Officer Tong heard nothing coming from the house; then he heard a male voice yelling from inside the house. The yelling was very loud and boisterous, and the male sounded very upset. Shortly thereafter, Officer Tong heard a female voice yelling back in a loud, high-pitched scream. He also heard children screaming and crying. Officer Tong waited for another unit to respond before approaching the house. Officer Stuart Yano (Officer Yano) testified that at approximately 12:54 p.m. he was sent to 146–B Maluniu because there was a report of someone being beaten at that address.

Officer Tong testified that he and Officer Yano (collectively, the officers) approached the house and knocked on the front door. A female identified as Pearl Carvalho (Carvalho) came to the door. Officer Tong stated that Carvalho was crying and had a wet face and shirt. Officer Tong noticed a redness from the side of her cheek down to the base of her neck. There was no swelling associated with the redness. Officer Yano testified that it did not look like she had been crying, but he noticed some redness to the right side of her neck and on her right arm.

Officer Tong testified that Carvalho indicated she and her boyfriend (Alvarez) lived together and they were involved in an argument. Officer Tong told Carvalho that he and Officer Yano needed to talk to her "other half." Carvalho then asked the officers to leave the residence, stating that if the officers were to talk to Alvarez, it would only make things worse. Carvalho appeared to Officer Tong like she was trying to hide something or did not want anything further to happen. Officer Tong again stated that the officers needed to talk to Alvarez because they wanted to figure out what was going on. Officer Tong entered the residence, stopped about one foot from the doorway, and watched Carvalho walk from the living room into the hallway area and disappear behind a wall. In a "regular voice," Carvalho asked Alvarez to come outside because the police wanted to talk to him. Alvarez yelled back at her that he was not going to talk to the police and that the police should get off his property.

Tong testified that Carvalho returned to the door and said Alvarez did not want to talk with them. Officer Tong again stated that they needed to talk with Alvarez and, if necessary, would enter the house to do so. Carvalho went back down the hallway and with a more commanding voice told Alvarez to come out and talk with the officers; she stated that if he did not come out, the officers would come in the house. Alvarez said he was not going to talk to the officers and the officers should get out of the house. Carvalho and Alvarez then got into a very loud argument, which lasted two to three minutes.

Officer Tong testified that shortly after the argument, Alvarez came out into the hallway.

Officer Tong could tell Alvarez was really upset because he gave the officers that "really mad look." Alvarez was sweating and stood with a posture that Officer Tong described as a "big body look"—a macho twisting of arms and jutting of shoulders. Officer Tong asked Alvarez what had happened and for some basic personal information, but Alvarez yelled, "I ain't telling you anything." Officer Tong asked Alvarez about three times for his basic information; eventually Carvalho started to give them his name because Alvarez was uncooperative. Alvarez continued telling the officers to get off his property.

Officer Tong testified that while attempting to get information from Alvarez, he was trying to determine what was going on, if there was an argument taking place, and whether any type of abuse had taken place. Based on Alvarez's actions and demeanor, the children's screaming and crying, and Carvalho's wet appearance and redness, Officer Tong believed that some type of physical confrontation had taken place. Since Carvalho had stated that an argument had occurred, the officers felt that more physical harm might take place once they left the residence.

Officer Tong testified the officers told Alvarez they were there on an argument-type call and they felt that the female and the children were in imminent danger of being hurt or exposed to physical harm after the officers left. The officers felt it would be better or wiser if Alvarez left the residence for a cooling-off period of twenty-four hours. Officer Yano testified that the officers believed the warning was a reasonable request given their observations.

Officer Tong testified that at this point Alvarez was not under arrest. Officer Tong did not physically possess a written twenty-four hour abuse warning citation form (warning citation), but there were such forms inside Officer Tong's vehicle. Officer Tong did not get a warning citation from his vehicle because Alvarez was yelling at the officers to get off his property and Officer Tong feared that if the officers left the front door area to get a warning citation, Alvarez and Carvalho would close the door and the officers would not have access back into the house.

Officer Tong testified that after he explained to Alvarez what the twenty-four hour cooling-off period involved, Alvarez said in a loud voice, "Well, I ain't leaving the fucking house." Officer Tong told Alvarez that Alvarez would have to leave the house at that point. Alvarez responded, "If I'm leaving this house, I'm taking my whole fucking family with me." Officer Tong told Alvarez that he could not take his family with him. Officer Tong testified that the point of the twenty-four hour warning period was to diffuse the situation and separate the two people involved.

Officer Tong testified that in order to avoid arresting Alvarez, who insisted on staying in the residence, Officer Tong alternatively offered that Carvalho and the children leave the residence. Officer Tong testified that arrest is a last resort when children are present and witnessing the situation. Alvarez yelled at the officers several times that neither he nor Carvalho were leaving the house.

Officer Tong testified he then told Alvarez that Alvarez had to leave the house or get arrested. Alvarez again refused, and, at approximately 1:10 p.m., he was placed under arrest for violating HRS § 709–906(4).[1]

Officer Tong testified that Officer Yano transported Alvarez to the police station. At

---

1. HRS § 709–906 (Supp.2000) provides, in relevant part, as follows:

 § 709–906 **Abuse of family or household members; penalty.** (1) It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member or to refuse compliance with the lawful order of a police officer under subsection (4). The police, in investigating any complaint of abuse of a family or household member, upon request, may transport the abused person to a hospital or safe shelter.

 For the purposes of this section, "family or household member" means spouses or reciprocal beneficiaries, former spouses or reciprocal beneficiaries, persons who have a child in common, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit.

 (2) Any police officer, with or without a warrant, may arrest a person if the officer has reasonable grounds to believe that the person is physically abusing, or has physically abused, a family or household member and that the person arrested is guilty thereof.

 (3) A police officer who has reasonable grounds to believe that the person is physically abusing, or has physically abused, a family or household member shall prepare a written report.

 (4) Any police officer, with or without a warrant, may take the following course of action where the officer has reasonable grounds to believe that there was physical abuse or harm inflicted by one person upon a family or household member, regardless of whether the physical abuse or harm occurred in the officer's presence:

 (a) The police officer may make reasonable inquiry of the family or household member upon whom the officer believes physical abuse or harm has been inflicted and other witnesses as there may be;

 (b) Where the police officer has reasonable grounds to believe that there is probable danger of further physical abuse or harm being inflicted by one person upon a family or household member, the police officer lawfully may order the person to leave the premises for a period of separation of twenty-four hours, during which time the person shall not initiate any contact, either by telephone or in person, with the family or household member; provided that the person is allowed to enter the premises with police escort to collect any necessary personal effects;

 (c) Where the police officer makes the finding referred to in paragraph (b) and the incident occurs after 12:00 p.m. on any Friday, or on any Saturday, Sunday, or legal holiday, the order to leave the premises and to initiate no further contact shall commence immediately and be in full force, but the twenty-four hour period shall be enlarged and extended until 4:30 p.m. on the first day following the weekend or legal holiday;

 (d) *All persons who are ordered to leave as stated above shall be given a written warning citation stating the date, time, and location of the warning and stating the penalties for violating the warning.* A copy of the warning citation shall be retained by the police officer and attached to a written report which shall be submitted in all cases. A third copy of the warning citation shall be given to the abused person;

 (e) If the person so ordered refuses to comply with the order to leave the premises or returns to the premises before the expiration of the period of separation, or if the person so ordered initiates any contact with the abused person, the person shall be placed under arrest for the purpose of preventing further physical abuse or harm to the family or household member; and

 (f) The police officer may seize all firearms and ammunition that the police officer has reasonable grounds to believe were used or threatened to be used in the commission of an offense under this section.

 (5) Abuse of a family or household member and refusal to comply with the lawful order of a

the station, Officer Tong prepared the warning citation. Officer Tong went over the warning citation with Alvarez at the station, but Alvarez refused to sign it. Officer Tong testified that the written warning citation indicated that it was given to Alvarez at 1:00 p.m., but the officers wrote the wrong time; the actual written warning citation was given to Alvarez at the police station at about 2:00 p.m.

Following the State's presentation of evidence, the defense moved for a judgment of acquittal based on: (1) a lack of evidence establishing that Alvarez and Carvalho were household members, and (2) the failure of the presented evidence to establish that Alvarez committed recent physical abuse or harm against Carvalho. The trial court denied Alvarez's motion.

Carvalho, testifying for the defense, stated that she and Alvarez argued about their financial situation that day for about fifteen minutes before the officers arrived. During the argument, Carvalho was in the back room of the house while Alvarez was in the bedroom. Carvalho described the tone of the argument as "very loud" because when she is angry, she expresses her anger by yelling. Carvalho cried during the argument because she did not get her way (she wanted Alvarez to go to work with her). At no time did the argument get physical or did she get hit or threatened. Carvalho did not call the police and did not know who did. Carvalho's son came running in the house to tell her the police were there to arrest Alvarez. Carvalho was still crying in the back room; she

then went to the bathroom to wash her face so the police would not see her crying. Carvalho wiped her face on her shirt sleeve and went to the door, where the officer stated that he had received a call regarding a fight and they needed to check on her to make sure everything was okay. When Carvalho opened the door, the officer standing there took one step inside the residence although Carvalho did not give him permission to enter.

Carvalho testified that a little while later Officer Yano walked up to the door. Carvalho told the officers that they did not need to be there because she and Alvarez had settled their differences and Alvarez had agreed to go to work with her. Carvalho did not tell the officers that things would get worse if the officers stayed; she told Alvarez that if he did not come out of the room to talk to the officers and give them the information they needed, it was only going to get worse. Carvalho gave the officer her personal information and told him that the argument was settled. The officer then stated that he needed to see and speak with Alvarez to get information from him. Carvalho believed that after she tried unsuccessfully to get Alvarez to come out and speak with the officers, her daughter went into the room and asked Alvarez to come out—which he did.

Carvalho testified that Alvarez looked upset when he finally came out of the room and Alvarez told the police officer he did not have to give the officer anything because the offi-

police officer under subsection (4) are misdemeanors and the person shall be sentenced as follows:
 (a) For the first offense the person shall serve a minimum jail sentence of forty-eight hours; and
 (b) For a second offense and any other subsequent offense that occurs within one year of the previous offense, the person shall be termed a "repeat offender" and serve a minimum jail sentence of thirty days.
Upon conviction and sentencing of the defendant, the court shall order that the defendant immediately be incarcerated to serve the mandatory minimum sentence imposed; provided that the defendant may be admitted to bail pending appeal pursuant to chapter 804. The court may stay the imposition of the sentence if special circumstances exist.

(6) Whenever a court sentences a person pursuant to subsection (5), it also shall require that the offender undergo any available domestic violence intervention programs ordered by the court. However, the court may suspend any portion of a jail sentence, except for the mandatory sentences under subsection 5(a) and (b), upon the condition that the defendant remain arrest-free and conviction-free or complete court-ordered intervention.

. . . .
(14) When a person is ordered by the court to undergo any domestic violence intervention, that person shall provide adequate proof of compliance with the court's order.
(Emphasis added.)

cer already knew who Alvarez was. The officers repeatedly asked Alvarez to step outside the house so they could speak with him, but Alvarez repeatedly asked the officers to leave. When Carvalho eventually talked Alvarez into going outside, one of the police officers asked Alvarez something; the next thing Carvalho knew the officers were arresting Alvarez and taking him to the police car. Carvalho remembers the officers asking Alvarez to leave; Alvarez saying he did not want to leave; and Alvarez further stating that if he did leave, he would take his family with him. Carvalho did not remember the officers stating what the consequences were for not leaving.

## II.

Alvarez contends the trial court erred by failing to instruct the jury that under HRS § 709–609(4), the offense of refusal to comply with a lawful order to leave the premises requires the material element of receiving a written warning citation prior to arrest.

 "When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given [were] prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Valentine*, 93 Hawai'i 199, 204, 998 P.2d 479, 484 (2000) (internal quotation marks omitted). "Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *State v. Pinero*, 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) (internal quotation marks omitted).

The trial court gave the jury a modified version of State's Instruction No. 1, which stated, in relevant part:

There are five (5) material elements of this offense, each of which the prosecution must prove beyond a reasonable doubt. These five elements are:

1. That on or about June 15, 1999, in the City and County of Honolulu, State of Hawai'i, Officer Barry Tong, an officer with the Honolulu Police Department had reasonable grounds to believe that there

was recent physical abuse or harm inflicted by the defendant upon a family or household member, regardless of whether the physical abuse or harm occurred in the officer's presence;

2. That Officer Tong had reasonable grounds to believe that there was probable danger of further physical abuse or harm being inflicted by the defendant upon a family or household member;

3. That Officer Tong lawfully ordered defendant to leave the premises for a period of separation of twenty-four (24) hours;

4. That the defendant refused to comply with the order to leave the premises; and

5. That the defendant's refusal was intentional, knowing or reckless.

Defense counsel made the following objection to the trial court's instruction:

MS. NAKASONE: (Inaudible) this is not an accurate instruction based on our interpretation of the statute 709[-]9[0]6 sub[section] 4 and also based on *State v. Kupela*.

With regard to the State's instruction subsection 1 where it begins that on or about, that part we believe is okay. The second element, we would not object to that.

With regard to the third element, we object to the use of the phrase lawfully ordered. We'd submit that the proper phrasing for the third element would be the way it's written in the defense instruction because that's the way 709[-]906 subsection 4, subsection b has it stated.

And with respect to element number 4, that we objected the way that element is phrased because we submit that our instruction is more accurate based on 709[-]906 4 subsection e[sic]. Those subsections 4 d and 4 e[sic] make clear that the person shall be given a written warning. And if the person (inaudible) so ordered then would need to comply with it. And so ordered, we would submit is referring to the prior subsection of written warning. If a person is so ordered pursuant to a written warning citation then refuses to leave, then they must arrest.

So we submit that that's—our instruction would be the more proper one based on the way the statute is written and would also add support.

With regard to the last part of our instruction, the last two paragraphs, we would submit that based on *State v. Kapela*, we believe that section on page 393 of *State v. Kapela* says this is the more accurate instruction. Based on that (inaudible).

Alvarez proposed the following Jury Instruction No. 1:

The Defendant, ELUJINO ALVAREZ, is charged with the offense of Refusal to Comply with a Lawful Order of a Police Officer.

There are five material elements of this offense, each of which the prosecution must prove beyond a reasonable doubt.

These five elements are:

1. That, on or about June 15, 1999, in the City and County of Honolulu, the police officer had reasonable grounds to believe that there was recent physical abuse or harm inflicted by the Defendant upon the complainant, Pearl Carvalho, a family or household member; and

2. That the police officer had reasonable grounds to believe that there was probable danger of further physical abuse or harm being inflicted by the Defendant upon the complainant; and

3. That the police officer issued a written warning citation to the Defendant, and such warning ordered him to leave the home for a cooling-off period of twenty-four hours; and

4. That prior to his arrest, the Defendant refused to comply with the written warning citation by failing to leave the premises; and

5. That the Defendant acted intentionally, knowingly, or recklessly in refusing to comply with the written warning citation and in failing to leave the premises.

To determine whether the police officer had reasonable grounds to believe that the Defendant inflicted recent physical abuse or harm on the complainant, there must be objective facts and circumstances other than the complainant's claim that she was beaten or abused, that would warrant a reasonable police officer to believe the complainant's claim.

To determine whether the police officer had reasonable grounds to believe that there was probable danger of further physical abuse or harm being inflicted by the Defendant upon the complainant, you may consider whether the police officer made reasonable inquiry of the complainant and other witnesses at the time of the incident.

Hawai'i Revised Statutes § 709–906(4)(d) is not clear on its face as to *when* "persons who are ordered to leave . . . shall be given a written warning citation stating the date, time, and location of the warning and stating the penalties for violating the warning."

■ "The interpretation of a statute is a question of law reviewable *de novo*." *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (internal quotation marks omitted).

. . . When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

*Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (footnote omitted) (quoting *State v. Toyomura*, 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)).

Hawai'i Revised Statutes § 701–104 (1993) provides for interpreting provisions of the Hawai'i Penal Code:

§ 701–104 Principles of construction. The provisions of this Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of the words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision.

The legislative history of HRS § 709–906(4) supports Alvarez's contention that receipt of a written warning citation prior to arrest for violation of HRS § 709–906(4) is a material element of the offense requiring proof beyond a reasonable doubt and was thus erroneously omitted from the jury's instructions.

As originally enacted in 1973, the new statutory section added to HRS chapter 709 that was codified as HRS § 709–906 stated, in relevant part, as follows:

> **Spouse abuse, penalty.** (a) It shall be unlawful for any person, singly or in concert, to physically abuse his or her spouse, or to refuse compliance with the lawful order of a police officer under subsection (c).
>
> . . . .
>
> (c) Any police officer may, with or without a warrant, take the following course of action where he has reasonable grounds to believe that there was a recent, substantial, physical harm inflicted by one spouse upon the other and where such physical harm has not occurred in his presence:
>
> (1) He may make reasonable inquiry of the spouse upon whom he believes recent, substantial, physical harm has been inflicted and other witnesses as there may be, to ascertain whether there is probable danger of further substantial, physical harm being inflicted upon such injured spouse by the other spouse; and
>
> (2) Where he has reasonable grounds to believe that there is such probable danger he may lawfully order such other spouse to voluntarily leave the premises for a cooling off period of three hours; and
>
> (3) If such spouse refuses to comply with such reasonable request or returns to the premises before the expiration of three hours, he may place such other

spouse under arrest for the purpose of preventing further physical harm to the injured spouse.

1973 Haw. Sess. L. Act 189, § 1 at 323–24.

Hawai'i Revised Statutes § 709–906(3) was amended in 1980 to authorize police to take certain follow-up measures, including the ordering of a three-hour cooling-off period, even when the police witnessed physical abuse. 1980 Haw. Sess. L. Act 266, § 2 at 509–10. Section 709–906(3) was further amended in 1983 to specifically authorize the police to arrest family or household abusers for spouse abuse regardless of whether or not the physical abuse occurred in the officer's presence. 1983 Haw. Sess. L. Act 248, § 1 at 526.[2]

In 1986, the legislature amended § 709–906(4) by adding a new paragraph to require the issuance of the written warning citation and by renumbering the paragraphs in subsection (4).

> (c) *All persons who are ordered to leave as stated above shall be given a written warning citation stating the date, time, and location of the warning and stating the penalties for violating the warning. A copy of the warning citation shall be retained by the police officer and attached to a written report which shall be submitted in all cases. A third copy of the warning citation shall be given to the abused person; and* [3]
>
> [(c)] (d) If the person so ordered refuses to comply with the order to leave the premises or returns to the premises before the expiration of twelve hours, the person shall be placed under arrest for the purpose of preventing further physical abuse or harm to the family or household member.

1986 Haw. Sess. L. Act 244, § 1 at 428 (new statutory material italicized; repealed statutory material bracketed). The Senate

---

**2.** The Supplemental Commentary to HRS § 709–906 (1993) states that "Act 266, Session Laws 1980, amended subsections (2) and (3) to authorize a police officer to make an arrest or take the actions specified in subsection (3) regardless of whether the physical abuse occurred in the officer's presence or not." Our review of the legislative history of HRS § 709–906 indicates, however, that it was actually 1983 Haw. Sess. L. Act 248 that effectuated the foregoing amendment.

**3.** By the 1991 Haw. Sess. L. Act 215, § 2 at 499–500, this 1986 subparagraph (c) became the current § 709–906(4)(d).

Judiciary Committee, in proposing the amendment requiring that police issue written citations to abusive persons, stated:

> The issuance of a written warning citation to the persons ordered to leave accomplishes several purposes intended to increase the effectiveness of police intervention in family and household abuse cases and to provide gr[e]ater protection for victims.

When the police issue a citation, a copy is retained by the police officer and copies are provided to the victim and the person ordered to leave the premises. The responding police officers are provided with an efficient means of transmitting information to officers who work during an immediately subsequent period and may be resummoned to the same household by the victim. The citation documents the time, place and location of the incident and specifies the penalties for violating the warning. By giving a copy of the citation to the abusive person, he or she is clearly informed of the conditions of the cooling-off period. In the event that the abusive person violates the · twelve hour cooling-off period, issuance of the citation eases prosecution by documenting the exact facts of the incident and providing evidence that the defendant was notified of the conditions of the police order.

Sen. Stand. Comm. Rep. No. 940–86, in 1986 Senate Journal, at 1225.

The 1986 amendment to HRS § 709–906 makes it clear the legislature intended that a written warning citation must be given to a person prior to being charged with violating HRS § 709–906. In *State v. Kapela,* 82 Hawai'i 381, 386, 922 P.2d 994, 999 (App.1996), this court stated it was the "warning citation" which was violated, not the oral order to leave the premises.

■ The trial court's failure to instruct the jury that the State was required to prove beyond a reasonable doubt that the officer issued a written warning citation to Alvarez prior to his arrest was therefore prejudicially erroneous.

## III.

Alvarez contends that there was insufficient evidence to find beyond a reasonable doubt the four elements of refusing to obey a lawful order in violation of HRS § 709–906(4). Specifically, Alvarez claims the trial court reversibly erred by concluding there was sufficient evidence to substantiate that (1) a cooling-off period was necessary, (2) Alvarez received a written citation as required by HRS § 709–906(4), and (3) Alvarez knowingly refused to leave the residence.

■ It is well settled that:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction. . . . The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.
>
> "Substantial evidence" . . . is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion.

*State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995) (quoting *State v. Batson,* 73 Haw. 236, 248–49, 831 P.2d 924, 931, *reconsideration denied,* 73 Haw. 625, 834 P.2d 1315 (1992)) (brackets added and in original).

■ We first address Alvarez's contention that there was insufficient evidence to support a finding that he received a written warning citation pursuant to HRS § 709– 906(4).

The State was required to prove beyond a reasonable doubt that the officer issued a written warning citation to Alvarez stating the date, time, and location of the warning and the penalties for violating the warning, and ordering him to leave the home for a cooling-off period of twenty-four hours or a specified enlarged period if the incident occurred after 12:00 p.m. on any Friday, or on any Saturday, Sunday or legal holiday.

At trial, Officer Tong testified that the written warning citation introduced as State's Exhibit 1 indicated that it was issued at 1300 (1:00 p.m.), the time of the offense.

Officer Tong believed "that we [the officers] both wrote the wrong time on it." According to Officer Yano's testimony, the officers never gave Alvarez a written warning citation ordering him to observe the specified cooling-off period at the time of the offense because "[w]e had it in the car but we didn't have it on our person at the time." Officer Tong testified that he gave Alvarez a verbal warning at 1:00 p.m., arrested Alvarez at 1:10 p.m., wrote out and signed (with Officer Yano) the written warning citation once they returned to the police station, and issued it to Alvarez at 2:00 p.m. Officer Tong testified that he went over the citation with Alvarez at the station. There was not substantial evidence that Alvarez received the written warning citation as required by HRS § 709–906(4) prior to his arrest for violation of the warning citation.

We need not address Alvarez's remaining contentions that the "cooling-off" period and the requisite state of mind were not supported by substantial evidence, and that his post-arrest conduct was irrelevant and/or impermissible character evidence under HRE 404(b).

## IV.

Accordingly, we reverse the November 17, 1999, judgment.